**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NAGIN KORMI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 16-cv-09415 |
| | ) | |
| ANTOINETTE CHOATE and | ) | Magistrate Judge Heather McShain |
| DAVID L. LEE, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' JOINT MOTION REGARDING *DAUBERT* CHALLENGES AND**
**OTHER ISSUES RELATED TO EXPERT TESTIMONY**

The Defendants, Antoinette Choate and David L. Lee, through their respective counsels, Daniel K. Konicek and Amir Tahmassebi of Konicek & Dillon PC and Daniel B. Meyer and Edward C. Eberspacher IV of Meyer Law Group LLC, move this Court to bar or limit the testimony of the expert witnesses disclosed by the Plaintiff, Nagin Kormi, as addressed below.[1]

## I.      SUMMARY

This Motion raises *Daubert* and related challenges to each of the four expert witnesses disclosed by the Plaintiff to support her cause of action.

As it relates to the Plaintiff's standard-of-care expert witness, John Bucheit, the Defendants seek to limit certain of his opinions because (a) they rest on flawed methodology and, (b) certain of his opinions relate to the damages the Plaintiff claims she would have been able to recover in the underlying employment litigation, but a jury would not have decided those damages in the employment case and thus should not be permitted to decide them in this case.

---

[1]      The Defendants file this Motion jointly to minimize the burden on the Court and the Plaintiff's counsel.

As it relates to the Plaintiff's breach-of-fiduciary expert witness, Mary Robinson, the Defendant seek to limit certain of her opinions because they provide nothing more than a conclusion that the Defendants breached fiduciary duties, and because those opinions fail to provide any causal link between the purported breaches and any of the Plaintiff's claimed damages.

As it relates to one of the Plaintiff's damages expert witness, Kathleen Graham, the Defendants move bar her testimony altogether because her opinions rest on flawed methodology.

As it relates to the Plaintiff's other damages expert witness, Dr. Louis Kraus, the Defendants move to bar his testimony altogether because he offers opinions that the Plaintiff suffered from emotional distress due to the Defendants conduct but (a) the Plaintiff is not entitled to recover emotional distress damages, and (b) even if she was so entitled, there is no expert testimony as to any fiduciary breach by the Defendants that purportedly caused her emotional distress.

## II.     AMENDED COMPLAINT AND THE PLAINTIFF'S EXPERT

This case arises from another case wherein the Plaintiff in 2012 filed a lawsuit captioned *Kormi v. Deloitte Consulting LLP*, 12-cv-02595 (N.D. Ill.), in which she accused her former employer of violating various federal employment statutes, including Title VII, the Americans with Disabilities Act and the Family Medical Leave Act ("Underlying Litigation").

In the Underlying Litigation, the Plaintiff was originally represented by another lawyer but, mid-way through the case, that other lawyer withdrew after the Plaintiff reneged on settlement terms reached during a July 2013 mediation.  The Plaintiff thereafter retained the Defendants to represent her, and the parties executed written documents forming the attorney-client relationship in January 2014; in one of those documents, the Plaintiff assigned to the Defendants her right to collect statutory attorney's fees from her former employer ("Assignment").  As the Underlying

Litigation progressed, settlement discussions resumed and, in August 2014, the Plaintiff ultimately agreed to settlement terms.

In October 2014, she and her former employer executed a written settlement agreement ("Underlying Settlement Agreement"), the operative terms of which (as far as this Motion is concerned) were (a) her former employer agreed to pay her $X in damages and agreed to pay the Defendants $Y pursuant to the fee-shifting provisions of the at-issue federal statutes, and (b) the Plaintiff agreed to not seek employment with her former employer or any contractor doing work for her former employer for a defined period of time ("no future employment" clause). Doc. 182.

On September 30 2016, the Plaintiff filed her initial Complaint in this action (Doc. 1), alleging that the Defendants breached their fiduciary duties (Count I) and the standard of care (Count II) during their representation of her in the Underlying Litigation. She also alleges that the Defendants had failed to return to her certain materials and files upon her May 2016 demand for them (Count III).

On February 8 2017, the Plaintiff filed the now-operative pleading in this case, an Amended Complaint. Doc. 27. Count I sets forth her breach of fiduciary duty claim, and alleges that the Defendants breached those duties in the following ways:

a.   Failing to obtain Plaintiff's informed consent concerning most aspects of her representation in violation of RPC 1.0(e);
b.   Failing to abide by their client's decisions concerning the objectives of representation and failed to abide by their client's decision whether to settle with Employer in violation of RPC 1.2;
c.   Failing to properly inform Plaintiff regarding all of the circumstances necessary to obtain Plaintiff's informed consent and failed to explain matters to Plaintiff sufficiently to permit her to make informed decisions regarding their representations in violation of RPC 1.4;
d.   Collecting an unreasonable fee in light of the amount of the fee ($99,500) compared to the limited amount of work performed in violation of RPC 1.5;
e.   Violating RPC 1.4(b) as a result of failing to:
    i.   disclose conflicts of interest and adverse consequences to their client resulting from the Purported Assignment at the time they required Plaintiff

            to execute the Purported Assignment;

    ii.      advise Plaintiff that she had a right to seek the advice of independent legal counsel concerning such adverse consequences;

    iii.     advise Plaintiff that the Purported Assignment would eliminate her unconditional right to waive her right to statutory attorneys' fees and transferred to Defendants her right to pay them their contingent fee under their Retention Agreement, rather than statutory fees, if that were in her best interest;

    iv.     inform her that the Purported Assignment was void and unenforceable; and

    v.      asserted the Purported Assignment as a property right which they would enforce to Plaintiff's detriment if Plaintiff refused to accept the settlement which Lee and Choate sought to impose upon her in violation of RPC 1.4(b) and 1.8(a).

f.      Demanding the Purported Assignment as a condition of representation, and acquired a pecuniary interest in the subject matter of the litigation, in violation of RPC 1.8(i);

g.      Failing to identify the potential conflicts of interest raised by the Purported Assignment at the time the Retention Agreement was executed, failed to provide correct legal advice at that time or when Employer made the Offer of Judgment when the potential conflict of interest manifested into an actual and un-waivable conflict, and when Employer made future offers to settle, in violation of RPC 1.16;

h.      Failing to safeguard Plaintiff's cost retainer in a separate and identifiable Trust account and failed to return such funds, or take diligent efforts to return such funds, at the conclusion of their representation in violation of Rule 1.15 (Doc. 27, ¶ 56(h));

i.      Threatening to withdraw as Plaintiff's counsel knowing that any attempted withdrawal would result in a material adverse effect on Plaintiff's interests is violation of RPC 1.16;

j.      Threatening to withdraw as Plaintiff's counsel without disclosing their obligations and Plaintiff's rights under RPC 1.16, including the fact that a Court would independently evaluate whether withdrawal was mandatory as a result of the conflicts of interests which the Defendants created under the circumstances and the fact that the Court could enforce Plaintiff's authority to decide whether to settle and allow Plaintiff sufficient time to engage new counsel and void the purported assignment to place Plaintiff in a position to obtain new counsel, in violation of RPC 1.2(a) and 1.16(c);

k.      Failing to advise Plaintiff that if they were permitted to withdraw, or required to withdraw as a result of the conflicts of interest associated with their enforcement of the Assignment, their contingent fee agreement and statutory lien would be unenforceable, pursuant to RPC 1.5(e)(2); and

l.      Subjecting Plaintiff to highly offensive practices which they knew, or should have known, would cause Plaintiff to suffer emotional distress and psychological injury separate and apart from her pecuniary interests which they had a fiduciary duty to protect.

Doc. 27, Count I (p.19), ¶ 56(a) through (l).

As to Count I, she alleges that her damages include (a) an amount that will compensate her for the loss she suffered as a result of the Defendants forcing her into an unfair settlement, including past and future losses resulting from the Underlying Settlement Agreement's "no future employment" clause, (b) compensatory damages in the form of pain, suffering and emotional distress caused by the Defendants' purportedly coercive and abusive conduct and other fiduciary breaches. Doc. 27, Count I, ¶ 59.

Count II sets forth her professional negligence claim, and alleges that the Defendants breached the standard of care they owed her in the following ways:

a. failing to provide reasonable counsel and/or to provide competent legal advice concerning matters about which Defendants accepted professional responsibility;

b. failing to act with reasonable competence and reasonable diligence by, *inter alia*, failing to take any discovery or retain any consultants or expert witnesses as they expressly advised the Plaintiff they would do, thereby failing to prepare the case for trial;

c. failing to provide competent representation in connection with their advice concerning damages, likelihood of success at summary judgment or trial or the proper protection of the client's interests;

d. failing to fully and adequately conduct legal research, ascertain facts and adduce evidence necessary to evaluate the strengths and weaknesses of the case and prepare the case for trial and thereby place Plaintiff, at a minimum, in a position for settlement negotiations which could be conducted with maximum strength and leverage;

e. failing to take adequate steps to determine and ameliorate the possible adverse consequences of any error or weakness in the conduct or strategy of prior counsel which they should have determined existed during the time that discovery remained open;

f. failing to adequately evaluate the various types of damages recoverable pursuant to each of the federal claims which Plaintiff asserted, the likelihood of success at trial, and the "settlement value" of her claims;

g. failing to maximize Plaintiff's settlement position by preparing the case for trial;

h. demonstrating almost immediately to Employer and its counsel that Defendants had no intention of going to trial and were only interested in a modest increase in the Offer of Judgment previously made;

i. failing to properly advise Plaintiff regarding the likelihood that Employer would file a motion for summary judgment, given numerous genuine issues of material facts and the burdens and expense of preparing such motion before the soon approaching court-ordered deadlines; and

j. failing to know and correctly advise Plaintiff that the Illinois Mediation Act

absolutely barred disclosure or use of anything that occurred during mediation in the course of litigation or otherwise.

Doc. 27, Count II (p. 24), ¶ 62.

As to Count II, she alleges damages in the amount that she would have obtained either at trial or as a result of settlement of the Underlying Litigation. Doc. 27, Count II, ¶ 64. Though unstated, she presumably calculates her damages to include a reduction that represents the amount she received by way of the Settlement Agreement.[2]

To prove her claims, the Plaintiff retained and disclosed four separate experts. As to Count I, she disclosed (a) Mary Robinson ("Robinson") to offer opinions to the effect that the Defendants breached various fiduciary duties and violated various Rules of Professional Conduct, (b) Kathleen Graham ("Graham") to offer opinions to the effect that the Plaintiff is unemployable due to the Settlement Agreement's "no future employment" clause, and (c) Dr. Louis J. Kraus ("Kraus") to offer opinions to the effect that the Plaintiff experienced emotional distress due to the Defendants' purportedly coercive and abusive conduct and other fiduciary breaches.

As to Count II, she disclosed John Bucheit ("Bucheit") to offer opinions to the effect that the Defendants breached the standard of care in their representation of the Plaintiff in the Underlying Litigation, and that such breaches proximately caused the loss of the full value of the Underlying Litigation. The Plaintiff also disclosed Bucheit to offer opinions regarding the settlement value or verdict value of the Underlying Litigation.

## III.    STANDARDS OF DECISION

The following Federal Rules of Evidence, and case law interpreting such Rules, pertain to this Motion.

---

[2]      The Amended Complaint also contained a Count III, that replicated the original pleading's Count III. The Court dismissed Count III on June 27, 2017. Doc. 58.

Rules 401, 402 and 403 pertain to evidence generally. Rule 401 states that:

> *Evidence is relevant if:*
>> *(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and*
>> *(b) the fact is of consequence in determining the action.*

Fed. R. Evid. 401.

Rule 402 states that:

> *Relevant evidence is admissible unless any of the following provides otherwise:*
> - *the United States Constitution;*
> - *a federal statute;*
> - *these rules; or*
> - *other rules prescribed by the Supreme Court.*
> *Irrelevant evidence is not admissible.*

Fed. R. Evid. 402.

Rule 403 states that:

> *The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.*

Fed. R. Evid. 402.

As it pertains to expert witnesses, the admissibility of expert testimony is regulated by Rule 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See*, *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Rule 702 states that:

> *A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:*
>> *(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;*
>> *(b) the testimony is based on sufficient facts or data;*
>> *(c) the testimony is the product of reliable principles and methods; and*
>> *(d) the expert's opinion reflects a reliable application of the principles*

*and methods to the facts of the case.*

Fed. R. Evid. 702.

To determine the admissibility of Rule 702 expert testimony, the district court must engage in a three-step analysis. First, it must determine if the witness is qualified. Second, it must determine whether the expert's methodology is reliable. Third, the district court must decide whether the expert's testimony will assist the trier-of-fact in understanding the evidence or determining a fact that is at issue. *Myers v. Ill. Cent. R.R.*, 629 F.3d 639, 644 (7th Cir. 2010). The goal of this analysis is to ensure that an expert witness employs the same intellectual rigor in his or her courtroom testimony as would be employed by an expert in the relevant field. *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007).

In undertaking the second step of the analysis, the district court's focus must be solely on the principles and methodology employed by the expert, and not on the expert's conclusions. *Daubert*, 509 U.S. at 595. *Daubert* sets forth a number of relevant factors the district court should consider in evaluating the expert's methodology, such as testing, peer review, error rates, and acceptability of the methodology in the particular field. *Id.*, 509 U.S. at 593-94. However, *Kumho Tire* recognizes that not all expert testimony derives from scientific fields, yet further holds that *Daubert* applies also to non-scientific expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *see also*, *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263-264 (7th Cir. 1996). As such, while Rule 702 and *Daubert* apply to all expert testimony, the test of reliability of an expert's methodology is a flexible one. *Id.*, 526 U.S. at 141.

Ultimately, however, the expert who supplies nothing but a bottom-line supplies nothing of value to the judicial process. *Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791-792 (7th Cir. 2008). Similarly, the expert who does nothing more than tell the jury what result to

reach is unhelpful and thus inadmissible. *Woods v. Lecureux*, 110 F.3d 1215 (6th Cir. 1997). Instead, it is "critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusions the expert's testimony is intended to support. *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003).

## IV.    ARGUMENT – JOHN BUCHEIT

The Defendants seek to bar and/or limit certain aspects of Bucheit's testimony.    In particular, the Defendants maintain that:

- Certain of Bucheit's opinions are based upon a methodology that is flawed and thus not reliable, and should thus be barred in accord with Rule 702 and *Daubert*;
- Bucheit's opinions include calculations of the back-pay and front-pay awards he believes the Plaintiff would have received in the Underlying Litigation.  These opinions should be barred on the ground that a jury would not have decided back-pay and front-pay in the Underlying Litigation, and thus a jury is not permitted to decide back-pay and front-pay in the present action;
- Even if a jury is permitted to decide that which federal law does not entrust them to decide, Bucheit's opinions as to back-pay and front-pay employ a flawed methodology for calculating those amounts by improperly expanding the timeframe for which back-pay would have been awarded in the Underlying Litigation (presuming the unlikely event that the Plaintiff had survived summary judgment and thereafter succeeded at trial) and improperly allowing for front-pay at all; and
- Bucheit should not be permitted to testify that the Court's ultimate ruling on the Defendants' summary judgment supports his opinions.  The Defendants moved for summary judgment, in part, on the ground that the Underlying Litigation would not have survived summary judgment, thus prohibiting her from proving the proximate cause element of her present causes of action.  The Court ultimately denied that motion, and the Plaintiff likely intends to use that denial to support Bucheit's opinions.

## A.    Bar Certain Opinions of Bucheit – *Daubert*

The Defendants move this Court to enter an Order barring the Plaintiff, and her witnesses, experts and attorneys, from making any statements, offering or eliciting any testimony or opinions, or making any arguments, directly or indirectly, that relate, refer or pertain to the opinions of John Bucheit as set forth in Section VI(2) through (6) of the Amended Expert Report of John E. Bucheit dated April 24, 2018.  In support of this Motion, the Defendants state as follows

1.    Relative to the Plaintiff's efforts to prove the cause of action set forth in Count II of the Amended Complaint – professional negligence – she disclosed Bucheit to offer expert testimony.  To that end, Bucheit prepared an Amended Expert Report dated April 24, 2018, and was subsequently deposed on September 25, 2018.  Ex. A, Amended Expert Report of John E. Bucheit dated April 24, 2018 ("Bucheit Report"); Ex. B, Deposition Transcript of John Bucheit dated September 25, 2018 ("Bucheit Deposition").

2.    Against this legal backdrop set forth in Section III of this Motion, the Plaintiff should be barred from offering certain opinions given by Bucheit in the Report and during his Deposition for the reason that his methodology is flawed and thus not reliable.  The subject opinions should thus be barred in accord with Rule 702 and *Daubert*.

3.    The Bucheit Report numbers nineteen pages and contains another eight pages of exhibits.  Bucheit's opinions begin at page 13, and are numbered (1) through (7).  This Motion challenges Opinions (2) through (6) as employing flawed and unreliable methodology.

**1.    Opinions (2), (3) and (4)**

4.    Bucheit provides a summary of Opinions (2) through (4) at the outset of the Report:  "In my opinion, had Choate and Lee [met the standard of care], at least some of Kormi's claims would have survived summary judgment, substantially increasing the settlement value of her case.  In such event, Deloitte would have almost certainly increased its settlement offer substantially."  Ex. A, Bucheit Report, p. 2.

5.    Breaking that summary down into its constituent parts, Opinion (2) begins:  "Defendants were negligent in their failure to undertake the work necessary to complete discovery, develop the evidentiary record, and position the case to defeat summary judgment and prepare it for trial."  Ex. A, Bucheit Report, p. 14.  Bucheit then describes the "work" that

the Defendants failed to undertake, which includes:

- Deposing various Deloitte employees, including Robert Holston, Robert Sohigian, Tom Williamson, Leah Lipskar and Armando Gonzalez, and its Rule 30(b)(6) corporate representative (the "Deloitte Witnesses"); *and*
- Moving to compel Deloitte to produce relevant documents, the existence of which had been disclosed on Deloitte's privilege log but not produced as being privileged (the "Deloitte Withheld Documents").

Ex. A, Bucheit Report, p. 14; *see also*, Ex. A, Bucheit Report, p. 9. Bucheit contends that these failures constituted breaches by the Defendants of their standard of care. Ex. A, Bucheit Report, pp. 14-15.

6. Opinion (3) begins: "Defendants misadvised Kormi regarding her available remedies and likelihood of success through a flawed and incomplete analysis," and continues: "Based on my experience, Deloitte's [sic] would have increased its settlement offer as the litigation progressed if Defendants had aggressively litigated the case and, as Lee acknowledged in his deposition, would have increased the offer substantially once Kormi defeated summary judgment." Ex. A, Bucheit Report, p. 15.[3]

7. Opinion (4) contends that "[h]ad Defendants met the requisite standard of care, it is highly likely that one or more of Ms. Kormi's claims would have survived summary judgment." Ex. A, Bucheit Report, p. 15.

8. The flaws in Bucheit's methodology were revealed during the Bucheit Deposition. First, Bucheit admitted that he does not know what testimony would have been elicited from the Deloitte Witnesses in the Underlying Litigation insofar as they were not deposed in that case. Ex. B, Bucheit Deposition, 113:20-114:14.

---

[3] Lee did not acknowledge during his deposition that the Plaintiff's former employer would have increased its settlement offer (much less "substantially") if the Plaintiff defeated summary judgment, or that the Plaintiff would have defeated summary judgment in the first instance, but those factual disputes are immaterial to this Motion.

9.      Second, he testified to not knowing whether the depositions of the Deloitte Witnesses, or the Deloitte Withheld Documents, were obtained in this case.  Ex. B, Bucheit Deposition, 202:9-203:5.  In fact, the Plaintiff did not depose the Deloitte Witnesses and did not obtain the Deloitte Withheld Documents in this case.

10.     Third, he admitted that he is unable to assess the Plaintiff's chances of defeating summary judgment in the Underlying Litigation insofar as Deloitte never actually filed the motion.  Ex. B, Bucheit Deposition, 165:19-116:12.

11.     Bucheit's lack of knowledge and his inabilities in these regards are no small matters, and reflect the flawed methodology he employed to arrive at Opinions (2), (3) and (4).  He opined that the Defendants' failure to depose the Deloitte Witnesses and compel production of the Deloitte Withheld Documents suppressed the Plaintiff's chances of defeating summary judgment and thus suppressed Deloitte's settlement offer.  He conversely opined that, had the Defendants met the standard of care by deposing the Deloitte Witnesses and compelling production of the Deloitte Withheld Documents, the Plaintiff's chances of defeating summary judgment would have increased and Deloitte's settlement offer would also have increased.

12.     The flaw in Bucheit's opinions is a simple one:  he does not know what testimony would have been elicited from the Deloitte Witnesses or what information would have been gleaned from the Deloitte Withheld Documents, and he thus has no basis to conclude that the testimony of the Deloitte Witnesses or the production of the Deloitte Withheld Documents would have increased the Plaintiff's chances of defeating summary judgment and thus would have increased Deloitte's settlement offer.  His opinions in this regard do not even rise to the level of guesswork.

13.     There is ultimately a logical disconnect between the Defendants' purported breaches and the purported consequences of those breaches. It does not follow that, if the Defendants had deposed the Deloitte Witnesses and obtained the Deloitte Withheld Documents, the Plaintiff's chances of defeating summary judgment would have increased, or that Deloitte's settlement offer would have increased. It depends on what the Deloitte Witnesses testified to at deposition and what the Deloitte Withheld Documents revealed. The Deloitte Witnesses and the Deloitte Withheld Documents may have supported Deloitte's position in the Underlying Action. The methodology Bucheit employed in arriving at his opinions did not control for this. His methodology did not include determining what the Deloitte Witnesses would have said and what the Deloitte Withheld Documents would have revealed.[4] Instead, it assumes – without foundation and based solely on speculation – that the testimony and documents would have favored the Plaintiff's position rather than Deloitte's.

14.     *Daubert* and Rule 702 do not permit expert testimony in such circumstances, for it is "critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusions the expert's testimony is intended to support. *Mamah*, 332 F.3d at 478; *see also*, *Barth v. Reagan*, 564 N.E.2d 1196, 1199-1200 (1990) ("Because the concept of *res ipsa loquitur* is not applicable in legal malpractice cases… the standard of care against which the attorney defendant's conduct will be measured must generally be established through expert testimony" (internal citation omitted)).

---

[4]     The flaw in Bucheit's methodology is not endemic to the Deloitte Witnesses not having been deposed, and the Deloitte Withheld Documents not having been obtained, in the Underlying Litigation. The Plaintiff could have deposed the Deloitte Witnesses, and sought production of the Deloitte Withheld Documents, in this proceeding as part of her effort to prove the case-within-the-case aspect of the proximate cause element of her Professional Negligence count. She did not.

15.    Here, Bucheit has "worked with" various documents as described in his Report. Those documents, in and of themselves, do not provide the "critical link" to the conclusions his testimony is intended to support. Importantly, Bucheit admitted this when he testified that he does not know what the Deloitte Witnesses would have said during deposition, and when he testified that he cannot assess what the Plaintiff's chances would have been of defeating Deloitte's anticipated motion for summary judgment.

16.    That Bucheit's Opinions (2) through (4) fail to provide this "critical link" renders his methodology flawed and unreliable, requiring that the Plaintiff be barred from offering those opinions into evidence during trial.

**2.    Opinions (5) and (6)**

17.    Opinion (5) posits that, when Defendant Choate advised the Plaintiff about the settlement value of her case against Deloitte in April 2014, she (Choate) did not properly calculate the Plaintiff's claim for back-pay, account for the Plaintiff's purportedly expected promotion during the back-pay period, or credit the Plaintiff with the full value of benefits she would have continued to receive but for her termination. Ex. A, Bucheit Report, p. 16. Bucheit concludes that the Plaintiff's back-pay claim amounted to $846,250, as calculated by him in a table imbedded in the Report. Ex. A, Bucheit Report, pp. 16-17.

18.    Opinion (6) builds on the "settlement value" theme and makes several contentions in that regard. First, Bucheit opines that Deloitte would have faced a potential judgment of $3,979,820 if it lost at trial, deriving that figure from Exhibit B to the Bucheit Report, a table Bucheit prepared that sets forth the Plaintiff's purported "Potential Recovery."

| Damages | Statute | Amount |
|---|---|---|
| Back pay | Title VII, FMLA, ADA | $ 846,250 |
| Front pay | Title VII, FMLA, ADA | $1,096,875 |
| Compensatory & punitive damages | Title VII, ADA | $ 300,000 |

| Liquidated damages | FMLA | $ 846,250 |
| Prejudgment interest | Title VII, FMLA, ADA | $ 90,445 |
| Attorney's Fees | Title VII, FMLA, ADA | $ 750,000 |
| Litigation Costs | Title VII, FMLA, ADA | $ 50,000 |
| Total: | | $3,979,820 |

Ex. A, Bucheit Report, p. 17 and Exhibit B thereto.

19. Second, Bucheit calculates the front-pay figure by (a) assuming a managerial salary, plus benefits, and then (b) multiplying that figure by five to represent a five-year front-pay award (from February 2015, the presumed trial date in the Underlying Litigation through January 2020). Employing this methodology, he concludes a front-pay award of $219,375 per annum, or $1,096,875. Ex. A, Bucheit Report, p. 17.

20. The flaws in Bucheit's calculations of back-pay and front-pay are evident. Regarding the Plaintiff's claim for back-pay, Bucheit ignores the fact that the Plaintiff obtained two <u>higher-paying</u> offers of employment within several months of her alleged discriminatory discharge and that Plaintiff accepted employment with one of those employers in spring 2011, which would have terminated her back-pay period.[5] See, e.g., *Gracia v. Sigmatron International, Inc.,* 130 F.Supp.3d 1249 ("Next, and most significantly, Gracia's back-pay award must take into consideration her earnings from a new job she obtained in 2010, at a company called Imagineering, Inc. According to W–2s submitted by Gracia, these earnings amounted to $20,016 in 2010 and $30,183 in 2011. Finally, because Gracia earned over $34,000 in 2012, the last year for which she has provided tax documents, **an amount more than what her earnings would have been at Sigmatron, calculation of her back-pay award ends with calendar-year 2011**.") (emphasis added).

---

[5] The amount of the Plaintiff's salary while employed by her former employer, and the amounts of the referenced job offers, are subject to protective order. These amounts are identified at Doc. 267 (SEALED), p. 2.

21. "Title VII provides that interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." *Donnelly v. Yellow Freight System, Inc.,* 874 F.2d 402, 411 (7th Cir. 1989). "Generally, a discharged employee must mitigate damages by using reasonable diligence in finding other suitable employment. Any back-pay award to a victim of discrimination must therefore be reduced by 'amounts earnable [by the employee] with reasonable diligence.'" *Stragapede v. City of Evanston,* 125 F.Supp.3d 818, 824 (N.D. Ill. 2015) (citations omitted); see also *Hutchison v. Amateur Electronic Supply, Inc.,* 42 F.3d 1037, 1044 (7th Cir. 1994) ("You cannot just leave the labor force after being wrongfully discharged in the hope of someday being made whole by a judgment at law."); see also *Mattenson v. Baxter Healthcare Corp.,* 438 F.3d 763, 771 (7th Cir. 2006) ("The familiar common law duty of mitigating damages is imposed: the employee must make a diligent search for comparable employment. Mattenson testified that he applied for jobs with all the companies and law firms that patent medical devices and none would give him a job…He was required to present persuasive evidence of inability to find a substitute job; the fact that he contacted 23 firms without success does not satisfy that burden, given the range of opportunities open to someone with his background and experience.")

22. With respect to Bucheit's front-pay calculation, there are two glaring flaws.  The first occurs when he ignores the case law on front-pay, which is an equitable remedy and must be established through persuasive evidence that the Plaintiff was unable to find substitute employment. *Mattenson v Baxter Healthcare Corporation*, 438 F.3d 763, 771-772 (7th Cir. 2006). Bucheit ignores the fact that the Plaintiff in fact did find substitute employment: she was employed and earned income during 2011 and 2012. The second occurs when he

fails to reduce his front-pay calculation to present cash value (as of the presumed February 2015 trial date), even though that is required and the Plaintiff cannot recover any front-pay without it. *Id.* Ex. B, Bucheit Deposition, 149:11-24; see also *Stragapede v. City of Evanston,* 175 F.Supp.3d 818, 833 (N.D. Ill. 2015). ("Here, Stragapede provides no discount rate for his front-pay calculation. Although it might seem like a technical requirement, **the failure to provide the discount rate is grounds for refusing to award front pay**.") (emphasis added).

23.    Third, Bucheit opines that:

> Had Deloitte assessed its risk of losing approximately $3,979,820 to be 50% - an outcome for which it would have to pay at least $575,000, if not more, in defense costs – Deloitte would have valued the cost of eliminating the risk and uncertainties of a trial to be $2,564,910 ($3,979,820 x 50% + 575,000).

> Ex. A, Bucheit Report, p. 18.

24.    Bucheit's Deposition reveals the flawed methodology that led to these opinions.  First, Bucheit calculates the Plaintiff's back-pay for the period July 2010 through February 2015 as totaling $998,404 and then (rightly) discounts that figure by $152,154 for income she earned during 2011 and 2012 with another employer.  What Bucheit failed to do is further discount that figure to account for income she earned through other employment between 2012 and 2015.

25.    Similarly, Bucheit calculates the Plaintiff's front-pay award for the period February 2015 through January 2020 as totaling $1,096,875.  What he failed to do is (a) discount that figure to account for income she earned through other employment between 2015 and the date of his report, and (b) discount the resulting figure to present cash value.

26.    The reason for Bucheit's failures in these regards stems from these basic facts:

- He did not read the transcripts of her depositions in this proceeding (Ex. B, Bucheit

Deposition, 24:1-25:5);

- He has never spoken to the Plaintiff (Ex. B., Bucheit Deposition, 110:13-14); *and*
- He has no knowledge of her employment, or of any income she earned though such employment, since 2012 (Ex. B, Bucheit Deposition, 110:15-18).

27.    Because Bucheit does not have any knowledge of employment income that the Plaintiff earned between 2012 and 2015 – constituting thirty-six months of the fifty-six-month back-pay period he adopted in Opinions (5) and (6) – he does not know that the Plaintiff in fact earned income through other employment during this thirty-six-month window. Importantly, he admits that such income would be deducted from any back-pay award. Ex. B, Bucheit Deposition, 143:18-144:6. And because he does not have any knowledge of employment income that the Plaintiff earned during the front-pay period (2015 through 2020), he does not know that the Plaintiff in fact earned income through other employment during the front-pay period. As was the case with back-pay, Bucheit admits that such income would be deducted from any front-pay award. Ex. B, Bucheit Deposition, 147:3-20.

28.    Bucheit's methodology in calculating the Plaintiff's back-pay and front-pay claims was thus flawed. His methodology did not include either the review of the transcripts of the Plaintiff's depositions in this proceeding, or interviewing her, to determine if she earned employment income for over half of the back-pay period he adopted, or during the front-pay period. His methodology is flawed for its failure to control for the possibility – indeed, the reality – that the Plaintiff earned employment income between 2012 and the date of his report.

29.    Bucheit's methodology with respect to front-pay is further flawed for its failure to reduce that figure to its present cash value (as of February 2015, the presumed trial date of the Underlying Litigation), even though he admits that a proper front-pay calculation includes

a reduction of the value to present cash value. Ex. B, Bucheit Deposition, 149:11-24.

30. In the first instance, this methodological failure renders unreliable his opinion that the Plaintiff's back-pay claim amounted to $846,250 (Opinion (5)) and her front-pay claim amounted $1,096,875 (Opinion (6)), for he acknowledges that employment income earned after 2012 would reduce her back-pay and front-pay claims. In the second instance, his failure in methodology renders unreliable his opinion that Deloitte's risk of an adverse verdict amounted to $3,979,820 (Opinion (6)), because that figure includes (a) the flawed back-pay calculation, (b) the flawed front-pay calculation, (c) a FMLA liquidated damages calculation that is based upon the flawed back-pay calculation, and (d) a pre-judgment interest calculation that is based upon the flawed back-pay calculation, the flawed front-pay calculation, and the consequently-flawed FMLA liquidated damages calculation.

31. Second, Bucheit did not employ any methodology at all in imposing on Deloitte a risk assessment of fifty percent that it would lose and the Plaintiff would win at trial, or in opining that, given that risk, "Deloitte would have valued the cost of eliminating the risk and uncertainties of a trial to be $2,564,910" (Opinion (6)). Neither in the Bucheit Report nor during Bucheit Deposition did he disclose his methodology for assessing Deloitte's risk of an adverse verdict at fifty percent, or his methodology for determining what "Deloitte would have" done based upon that risk assessment. He undertook no evaluation of the record to arrive at the conclusion that Deloitte stood a fifty percent chance of an adverse verdict, and pointed to nothing in the record (*e.g.*, a deposition of a Deloitte employee, or Deloitte's attorney in the Underlying Litigation) to support the notion that "Deloitte would have valued the cost of eliminating the risk and uncertainties of a trial to be $2,564,910." He similarly pointed to nothing in the record to support his conclusion

that "Deloitte would have almost certainly increased its settlement offer substantially" if the Plaintiff had defeated summary judgment, insofar as there is no testimony in the record from a Deloitte employee or its counsel in the Underlying Litigation that Deloitte would have done so. In this respect, Bucheit supplied nothing but a bottom-line, and his Opinion (6) thus adds nothing to the judicial process. *Wendler & Ezra*, 521 F.3d at 791-792.

32. Third, Bucheit ignored altogether the effect of Deloitte's anticipated motion for summary judgment in his "bottom line" risk assessment. While Bucheit admitted that he is unable to assess the Plaintiff's chances of defeating summary judgment in the Underlying Litigation insofar as Deloitte never actually filed the motion (Ex. B, Bucheit Deposition, 165:19-116:12), Deloitte would have known the arguments it would raise on summary judgment, and it would also have been able to gauge the likelihood of those arguments prevailing. Measured against the subsequent chances at trial on those claims, Deloitte would have been able to assess its own "weighted average" exposure.

33. But as a result of his being unable to determine the summary judgment survivability of each of the Plaintiff's seven underlying claims, Bucheit's risk assessment methodology inherently assigns each claim a one hundred percent survivability factor when he purports to consider that Deloitte was facing a fifty percent chance of losing at trial. In actuality, had Deloitte assigned any possibility that it would be successful on any of the Plaintiff's seven claims, a fifty percent chance of winning at trial would necessarily have yielded something less than fifty percent weighted average outcome. Deloitte's actual assessment of its "worst day" would have instead been directly equivalent to overall respective possibilities Deloitte had assigned to each of the Plaintiff's seven claims surviving summary judgment. Bucheit's methodology fails to account for this reality.

34.     Moreover, many of the Plaintiff's causes of action in the Underlying Litigation had different remedial schemes. For instance, as Bucheit acknowledges in the Potential Recovery table attached to the Bucheit Report as Exhibit B, liquidated damages were available only under her FMLA claims, and compensatory damages and punitive damages were available only under her Title VII and ADA claims. Ex. A, Bucheit Report, Exhibit B thereto. By failing to undertake any analysis as to the survivability of each claim on summary judgment, Bucheit's methodology failed to account for the potential that her FMLA claims would not survive (and thus that she would not be entitled to recover liquidated damages) or that her Title VII and ADA claims would not survive (and thus that she would not be entitled to recover compensatory or punitive damages).

35.     But in the larger respect, Bucheit's opinions as set forth in Opinions (5) and (6) rest upon flawed and thus unreliable methodology, as described above, and in that sense violate the core goal of the *Daubert*/Rule 702 analysis: ensuring that an expert witness employs the same intellectual rigor in the courtroom as he or she does in her office. *Jenkins*, 487 F.3d at 489. As set forth in his Opinions (2) through (6), Bucheit's methodology is flawed and thus unreliable for:

- Failing to account for testimony that could have been elicited from the Deloitte Witnesses;
- Failing to account for information that could have been obtained from the Deloitte Withheld Documents;
- Failing to determine how Deloitte assessed its chances of obtaining summary judgment;
- Failing to assess the Plaintiff's chances for surviving Deloitte's anticipated summary judgment on a count-by-count basis;
- Failing to account for employment income earned by the Plaintiff during the back-pay period;
- Failing to account for employment income earned by the Plaintiff during the front-pay period;
- Failing to reduce his front-pay calculation to present cash value;
- Failing to employ any methodology at all in assessing Deloitte's risk of an adverse

verdict; *and*

- Failing to account for summary judgment survivability in arriving at Deloitte's fifty-percent risk assessment.

36. In short, Bucheit excluded from his methodology any factor that would adversely affect his opinions and, ultimately, the Plaintiff's position. The Plaintiff should thus be barred from offering Bucheit's Opinions (2) through (6) into evidence at trial.

Wherefore, the Defendants respectfully request that this Honorable Court enter an Order barring the Plaintiff, and her witnesses, experts and attorneys, from making any statements, offering or eliciting any testimony or opinions, or making any arguments, directly or indirectly, that relate, refer or pertain to the opinions of John Bucheit as set forth in Section VI(2) through (6) of the Amended Expert Report of John E. Bucheit dated April 24, 2018.

## B.     Bar Evidence of Back-Pay and Front-Pay Relative to the Underlying Litigation

The Defendants request that this Honorable Court enter an Order barring the Plaintiff, and her witnesses, experts (including specifically Bucheit) and attorneys, from making any statements, offering or eliciting any testimony or opinions, or making any arguments, directly or indirectly, that relate, refer or pertain to the Plaintiff's entitlement to, and the amount of, back-pay and/or front-pay that she may have been awarded in the Underlying Litigation, and in support thereof state as follows:

1. As addressed in the preceding Section of this Motion, the Plaintiff has disclosed Bucheit to offer opinions regarding various aspects of the Underlying Litigation, and amongst those opinions are his calculations of the back-pay and front-pay awards that, in his opinion, the Plaintiff would have received in the Underlying Litigation had it gone to verdict and judgment.

2. Bucheit's flawed methodology aside, the Plaintiff should be barred from presenting

evidence to the jury regarding her supposed entitlement to back-pay and front-pay. In the Underlying Litigation, presuming that the Plaintiff had convinced the jury that her former employer had violated one of the at-issue federal statutes, that jury would not have determined the Plaintiff's entitlement to, and amount of, back-pay and/or front-pay to be awarded to the Plaintiff. Rather, the trial court presiding over the Underlying Litigation would have made that determination. *Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 499 (7th Cir. 2000) (juries determine entitlement to and amount of compensatory damages while trial courts determine entitlement to and amount of equitable relief, including back-pay and front-pay).

3. Where an issue in underlying litigation would have been decided by a trial court rather than by a jury, that same issue in the legal malpractice case must be decided by a trial court rather than by a jury. This concept recognizes that a jury should not assume a role in a legal malpractice case that the legislature has specifically committed to the discretion of a trial court. *First Nat'l Bank v. Lowrey*, 872 N.E.2d 447, 470 (1st Dist. 2007).

4. Here, Congress has explicitly vested trial courts with the discretion to determine a civil rights' plaintiff's entitlement to, and amount of, back-pay and front-pay. In doing so, Congress has excluded juries from any decision-making role with respect to back-pay and front-pay. In this legal malpractice case, the jury should similarly be excluded from any determination as to the Plaintiff's entitlement to, and amount of, back-pay and front-pay.

5. *Lowrey* is a legal malpractice case arising out of an underlying medical malpractice case involving a minor. *Id.*, at 455. Prior to the trial in the underlying case, the underlying defendant made a settlement offer to the plaintiffs but their attorney purportedly failed to communicate that offer to the plaintiffs, with the result that the underlying case proceeded

to verdict in favor of the underlying defendants. *Id.*, at 455-56. In the malpractice case, the attorney-defendants maintained that the underlying defendants' settlement offer would have to have been approved by an underlying court (because the case involved a minor) and that it would not have been. *Id.*, at 467. More particular to the issue here, the attorney-defendants further maintained that the legal malpractice trial court, and not the jury, was required to decide whether the settlement offer would have been approved by an underlying court. *Id.* The trial court rejected the attorney-defendants' position in this regard. *Id.*

6.    On appeal, the Illinois Appellate Court held that it was the responsibility of the legal malpractice trial judge to determine whether the settlement in the underlying medical malpractice case would have been approved by the underlying court. Id., at 470. In doing so, the Court observed:

*We do not believe that the jury should assume a role in a legal malpractice case that the legislature has specifically committed to the discretion of the trial court. To do so would be contrary to the legislature's intent and would give the jury a power in the context of a legal malpractice case that it would not otherwise possess.*

Id.;[6] *accord*, *Governmental Interinsurance Exch. v. Judge*, 850 N.E.2d 183 (S. Ct. 2006) (in appellate malpractice litigation, trial court and not jury determines whether a different appellate result would have occurred but for the attorney's breach of the standard of care because appellate issues are the province of judges not juries).

7.    Because Congress has decided that trial judges and not juries decide a civil rights'

---

[6]    Despite this holding, the Appellate Court ultimately affirmed the judgment. While the trial court rejected the attorney-defendant's position that it is the trial court who should decide whether an underlying court would have approved the settlement, the trial court noted at the same time that it felt the underlying defendants' settlement offer was fair and reasonable and thus would have been approved by an underlying court. *Id.*, at 467. The Appellate Court then concluded that the record clearly established that the underlying court would have approved the settlement. *Id.*, at 471.

plaintiff's entitlement to, and the amount of, back-pay and front-pay, questions of the Plaintiff's entitlement to, and the amount of, back-pay and front-pay in the Underlying Litigation should not be presented to the jury. Rather, if the Plaintiff proves that the Defendants breached their standard of care, and if the Plaintiff proves her case-within-the-case to the effect that her former employer violated any one of the at-issue federal statutes, only then shall questions of back-pay and front-pay arise, and those questions – entitlement and amount – should be determined by this Court post-verdict.

Wherefore, the Defendants respectfully request that this Honorable Court enter an Order barring the Plaintiff, and her witnesses, experts and attorneys, from making any statements, offering or eliciting any testimony or opinions, or making any arguments, directly or indirectly, that relate, refer or pertain to the Plaintiff's entitlement to, and the amount of, back-pay and/or front-pay that she may have been awarded in the Underlying Litigation.

## C.     In the Alternative to Section IV.B, Limit Bucheit's Opinions As to Back-Pay and Front-Pay

In the alternative to the relief sought in the immediately preceding section, the Defendants move this Honorable Court to enter an Order barring the Plaintiff, and her witnesses, experts (specifically including Bucheit) and attorneys, from making any statements, offering or eliciting any testimony or opinions, or making any arguments, directly or indirectly, that relate, refer or pertain to purported back pay relief for the period May 2011 through February 2015 and/or purported front pay relief, and in support thereof state:

1.     The Defendants adopt and incorporate herein their prior Motion *in Limine* No. 13 (Doc. 276 UNDER SEAL) and their Reply in Support of their Motion Motion *in Limine* No. 13

(Doc. 314).[7]

Wherefore, the Defendants request that this Honorable Court enter an Order barring the Plaintiff, and her witnesses, experts and attorneys, from making any statements, offering or eliciting any testimony or opinions, or making any arguments, directly or indirectly, that relate, refer or pertain to purported back pay relief for the period May 2011 through February 2015 and/or purported front pay relief.

## D.    Bar Reference to the Court's Ruling on the Defendants' Motions for Summary Judgment

The Defendants move this Honorable Court to enter an Order barring the Plaintiff, and her witnesses, experts (specifically including Bucheit) and attorneys, from making any statements, offering or eliciting any testimony or opinions, or making any arguments, directly or indirectly, that relate, refer or pertain to the  Defendants' Motions for Summary Judgment and this Court's ruling on those Motions, and in support thereof states as follows:

1.    On December 18, 2018, Defendant Lee filed a Motion for Summary Judgment. (Doc. 159). Defendant Choate joined Defendant Lee's Motion on December 18, 2018. (Doc. 162).  The Defendants set forth three bases to support their Motion for Summary Judgment: (1) Count I (breach of fiduciary duty) and Count II (legal malpractice) presented duplicative claims and thus Count I should be dismissed; (2) the Plaintiff filed the present action after the expiration of the applicable statute of limitations; (3) the Underlying Litigation would have been dismissed pursuant to summary judgment, which represents a failure of the proximate

---

[7]    For context, this case was scheduled for trial on June 17 2019 and the parties filed their respective motions *in limine* in advance of that trial date.  For reasons not particularly pertinent here, that trial date was vacated. (Doc. 329)  Thereafter, the case was reassigned to then-newly appointed District Judge Martha Pacold (Doc. 340), the case was rescheduled for trial on May 18 2020 (Doc. 349), and Judge Pacold struck the entirety of the parties' previously filed motions *in limine* without prejudice (Doc. 362).  It is to one of those motions – the Defendants' Motions *in Limine* No. 13 – that this sentence refers.

cause element (the case-within-the-case) of her present causes of action.

2.  On July 13 2022, the Court denied the Defendants' Motions for Summary Judgment. As to the second and third grounds of the Defendants' Motions for Summary Judgment, the Court denied those grounds because the Defendants' prior counsel did not support the Motion with citations to a Local Rule 56.1 Statement of Undisputed Material Facts; in other words, the Court did not reject those grounds on their merits. Doc. 383.

3.  Any reference or testimony by the Plaintiff about the Defendants' Motion for Summary Judgment or the Court's ruling thereon would constitute a violation of the Rules of Evidence as irrelevant (Fed. R. Evid. 402). Moreover, the probative value of such testimony is substantially outweighed by the prejudice to the Defendants; thus, even if the Court finds the evidence otherwise admissible, it should nonetheless be deemed inadmissible in accord with Rule 403.

4.  In particular, any testimony or reference insinuating that the Underlying Litigation would have survived summary judgment is both irrelevant and highly prejudicial.

5.  First, attorney conduct cannot be weighed in hindsight. *Goldstein v. Lustig*, 154 Ill.App.3d 595, 600 (1st Dist. 1987). Thus, informing the jury that the Underlying Action would have survived summary judgment because of this Court's ruling on the third basis for the Defendants' Motion for Summary Judgment constitutes an irrelevant piece of evidence; the Defendants could not have known what would happen to the Underlying Litigation at the time it was settled, as no ruling from a court had been made. Consequently, the Court's ultimate ruling on the Defendants' Motion for Summary Judgment is irrelevant and should be barred in accordance with Rule 402 as irrelevant.

6.  Moreover, the Court's ultimate ruling on this aspect of the Defendants' Motions for

Summary Judgment was not even made on the merits. The Court did not rule that any aspect of the Underlying Litigation would have survived summary judgment. Rather, the Court denied the Motions because the Defendants' prior counsel did not comply with Local Rule 56.1 when filing the Motions. That the Court's ultimate ruling was not made on the merits renders the evidentiary value of the ruling meaningless. Further, if the Plaintiff is permitted to introduce into evidence the fact of the Court's ruling, the Defendants would then cross-examine any such offering witness on the differences between rulings on the merits of an argument and rulings made based on procedural deficiencies; such examination will undoubtedly confuse a jury of laypersons not educated or trained in such intricacies (Fed. R. Evid. 403).

7. To the extent that testimony about the Court's ruling on the Defendants' Motion for Summary Judgment is deemed relevant, the probative value of such evidence is substantially outweighed by the prejudice that will be occasioned on the Defendants. Initially, the Court's ultimate ruling on the Motions has no probative value at all because the Defendants, when advising the Plaintiff during the Underlying Litigation about the chances that such a motion would be granted, did not have the benefit of the Court's ruling.

8. Moreover, such evidence would be highly prejudicial to the Defendants in that it would likely sway the jury toward making an inference that the Underlying Litigation would have definitely survived summary judgment, whereas at the time settlement was reached in the Underlying Litigation, the Defendants could only offer their professional opinions as to the likelihood that the Plaintiff's underlying claims would not survive summary judgment. Thus, admitting evidence regarding the Defendants' Motions and the Court's ultimate ruling on these Motions would confuse and mislead the jury and such evidence should thus

be excluded. Fed. R. Evid. 403).

9. As the Seventh Circuit observed in <u>Georgou v. Fritzshall</u>, 178 F.3d 453, 456 (7th Cir. 1999), "Hindsight is wonderful but in Illinois is not enough to collect damages…" How this Court ultimately treated the Defendants' Motion for Summary Judgment as it relates to the proximate cause element in July 2022 is simply not relevant to the question of whether the advice given by the Defendants to the Plaintiff during the summer of 2014 constitutes a breach of the standard of care. Moreover, the Court's July 2022 ruling does not even help the jury consider whether the Defendants' advice met the standard of care because the ruling does not address the merits of the question of whether the Plaintiff's former employer's motion for summary judgment in the Underlying Litigation would have succeeded.

Wherefore, the Defendants respectfully request that this Honorable Court enter an Order barring the Plaintiff, and her witnesses, experts and attorneys, from making any statements, offering or eliciting any testimony or opinions, or making any arguments, directly or indirectly, that relate, refer or pertain to the Defendants' Motion for Summary Judgment.

## V.      ARGUMENT – MARY ROBINSON

The Defendants seek to limit Robinson's testimony in two respects: (a) Robinson should not be permitted to offer opinions to the effect that the Defendants violated any of the Rules of Professional Conduct, and (b) Robinson should not be permitted to offer opinions to the effect that the Assignment was obtained by the Defendants illegally or unethically, or that the Assignment is void or unenforceable.

### A.      Bar Robinson from Testifying that the Defendants Violated the Rules of Professional Conduct

The Defendants move this Honorable Court to enter an Order barring the Plaintiff, and her

witnesses, experts (specifically including Robinson) and attorneys, from making any statements, offering or eliciting any testimony or opinions, or making any arguments, directly or indirectly, that relate, refer or pertain to the purported violations of the Illinois Rules of Professional Conduct, and in support thereof state as follows:

1. "Opinions that amount to legal conclusions do not assist the trier of fact, and expert testimony that is 'largely on purely legal matters and made up solely of legal conclusions' is not admissible." *Client Funding Solutions Corp. v. Crim*, 943 F.Supp.2d 849, 863 (N.D.Ill. 2013), citing *inter alia CDX Liquidating Trust ex rel. CDX Liquidating Trust v. Venrock Associates*, 411 B.R. 571, 587 (N.D.Ill. 2009) ("The [proffered expert] cannot judge what the Defendants did or did not do, nor whether they violated the law.").

2. In *Crim*, the Court barred Robinson from testifying that the lawyers' conduct in that case "constituted a breach of fiduciary duty." *Crim*, 943 F.Supp.2d at 863. While the Court in *Crim* allowed Robinson to identify the professional and ethical obligations imposed on attorneys and provide her take on "concrete information," the Plaintiff here intends to call Robinson in this case to testify that the Defendants violated various Illinois Rules of Professional Conduct. See generally, Ex. E, Expert Report of Mary Robinson dated March 23 2018 ("Robinson Report").

3. First, Robinson intends to offer legal distinctions between the Assignment, on the one hand, and contingency fee contracts and statutory attorneys' liens, on the other. To reach this distinction, and concomitantly opine that the Defendants' assignment was "in violation of Rule 1.8(i) of the 2010 Illinois Rule of Professional Conduct whereas contingency fees and liens are not," Robinson offers the impermissible legal conclusion that the Assignment "gave [the Defendants] control of a cause of action." Ex. E, Robinson Report, p. 6.

4.     Second, Robinson intends to testify that the Assignment constituted a concurrent conflict of interest in that it created a significant risk that the Defendants' representation of the Plaintiff would be materially limited by their personal interest in recovering a fee. As such, according to Robinson, the Assignment "encumbered" the Defendants with an un-waivable conflict of interest in violation of Rule 1.7(a)(2) (miscited as Rule 1.7(a)(1) in Robinson's report). Ex. E, Robinson Report, p. 7. Despite straining for a distinction between assignments and contingency fees in the first part of the Robinson Report, she offers no analysis of how the Assignment gave the Defendants any greater personal interest in recovering a fee than they would have had under a simple contingency fee agreement alone, where both are necessarily dependent on the Plaintiff succeeding in the Underlying Litigation to generate entitlement to a fee.

5.     Third, Robinson "deems" the Defendants to have obtained the Assignment "by means of undue influence" via a violation of Rule 1.8(a) by entering into a business transaction with a client. See Ex. E, Robinson Report, pp. 7-8. This series of legal conclusions is in turn founded upon the initial legal conclusion that Rule 1.8(a) applies to the Assignment notwithstanding the fact that it was negotiated before the formation of the attorney client relationship. See Ex. E. Robinson Report, p. 8. However, a contract formed between two people as part of a retention necessarily means that there was no existing attorney-client relationship in existence at the time of the allegedly offending agreement. And indeed, the law is directly contrary to the opinion Robinson offers here. See *Ball v. Kotter*, 723 F.3d 813, 826-27 (7th Cir. 2013) ("[W]here the existence of a fiduciary relationship has been established, the law presumes that any transaction between the parties, by which the dominant party has profited, are fraudulent." .* * * "[The] presumptions of [fraud and

undue influence] arise from a fiduciary's general duty to 'refrain from seeking a selfish benefit <u>during the relationship</u>.'") (citations omitted) (emphasis added). See also *In re Owens*, 144 Ill.2d 372, 377 (1991) (no violation of the business transaction rule where Owens had not been retained <u>prior to</u> the formation of a partnership with the eventual client); and *White v. Richert*, 2016 WL 3582083, * 3 (N.D.Ill. 2016) ("presumption of undue influence arises when an attorney enters into an agreement or transaction with a client <u>after the attorney-client relationship exists</u>.") (Magistrate J. Schenkier) (emphasis added). Thus, not only would Robinson be opining on the application of law to the facts of this case, she would be reaching the wrong legal conclusion.

6.    Indeed, Robinson continues to her fourth opinion by returning to Rule 1.7(a)(2) – albeit while still citing to Rule 1.7(a)(1) – in assessing the impropriety of the Defendants' handling of the settlement negotiations in the Underlying Litigation. Ex. E, Robinson Report, p. 8. In doing so, Robinson offers no analysis as to how maximizing the amount Deloitte would pay in attorneys' fees – and correspondingly reducing the contingency fees the Plaintiff would be responsible for under the contingency fee aspect of her agreement with the Defendants – was somehow the result of compromised loyalties separate and apart from what would have occurred in the absence of the Assignment. As such, Robinson intends to offer a legal conclusion regarding the existence of compromised loyalties in support of another legal conclusion that Rule 1.7(a)(2) has been violated, neither of which are permissible. *Crim*, 943 F.Supp.2d at 863.

7.    Finally, Robinson suggests that the Defendants violated Rule 1.2(a) by purportedly "using [the Assignment] to pressure the client to agree to a settlement she was resisting." Ex. E, Robinson Report, p. 9. As stated in *Crim*, Robinson's opinion in this regard "would

necessarily be deeming Plaintiff's version of the facts to be the credible account, which is prohibited." *Crim,* 943 F.Supp.2d at 863, citing *CDX Liquidating Trust*, 411 B.R. at 587.

Wherefore, the Defendants respectfully request this Honorable Court enter an Order barring the Plaintiff, and her witnesses, experts and attorneys, from making any statements, offering or eliciting any testimony or opinions, or making any arguments, directly or indirectly, that relate, refer or pertain to the purported violations of the Illinois Rules of Professional Conduct.

## B.     Bar Robinson From Testifying to the Effect that the Assignment is Illegal, Void, Unenforceable, Unethical or the Like

The Defendants move this Honorable Court to enter an Order barring the Plaintiff, and her witnesses, experts (specifically including Robinson) and attorneys, from making any statements, offering or eliciting any testimony or opinions, or making any arguments, directly or indirectly, that relate, refer or pertain to the assignment as illegal, void, unenforceable, unethical, or the like, and in support thereof state as follows:

1.     As posed in the Plaintiff's Amended Complaint, the "catalyst" that precipitated this lawsuit was the Defendants' purported demand for and receipt of the Assignment of the Plaintiff's statutory right to seek prevailing-party attorney's fees against Deloitte in an underlying lawsuit as part of the Defendants' agreement to represent the Plaintiff, as successor counsel, in that case.  See Doc. 27, at ¶ 1.

2.     Throughout the Amended Complaint, the Plaintiff referred to the Assignment as "void." See Doc. 27, ¶¶ 3 and 20(f).  She has also referred to it as "unenforceable."  Doc 27, ¶ 56(e)(iv).  Later in this litigation, she claimed that the Assignment was "against public policy," "bar[red]," "fraudulent," and essentially, "contaminated."  See Doc. 71 p. 1 (void), ¶ 5 (against public policy and bar[red]), ¶ 10 and 13 (fraudulent), and ¶ 3 (contaminated).

3.     As shown by Doc. 71 (Plaintiff's Motion to Schedule an Evidentiary Hearing), the Plaintiff

acknowledged over six years ago that such characterizations of the assignment involved an intrinsic legal question that had yet to be resolved.

4. On September 26, 2017, this Court denied the Plaintiff's Motion as premature, given that fact discovery was then incomplete and no depositions had taken place. See Doc. 73.

5. The time for fact discovery and depositions has come and gone, with only trial of this matter left to be completed.

6. While the Plaintiff asserts legal malpractice in Count II of her Amended Complaint, that Count does not seek a determination that that the Assignment is void, illegal, unenforceable, against public policy, fraudulent, barred, or contaminated as part of the Plaintiff's case-within-a-case. In other words, the Plaintiff is seeking the attorney's fees she purportedly would have recovered in the Underlying Litigation from Deloitte, including those incurred by the Defendants during their representation of her in the Underlying Litigation, without any need to set-aside the Assignment, thereby implicitly acknowledging that the Assignment did nothing to inhibit her ability to recover those fees from Deloitte should she have prevailed in the Underlying Litigation instead of settling.

7. Accordingly, referring to the Assignment as void, illegal, unenforceable, against public policy, fraudulent, barred, or contaminated has no tendency to prove or disprove any fact of consequence to this litigation, and would therefore be irrelevant under Rule 402. To the extent these characterizations would have any relevance, that relevance would be far outweighed by the prejudice to the Defendants from such untested – and never to be tested – legal conclusions being invoked before the jury, and should alternatively be barred under Rule 403.

Wherefore, the Defendants respectfully request that this Honorable Court enter an Order

barring the Plaintiff, and her witnesses, experts and attorneys, from making any statements, offering or eliciting any testimony or opinions, or making any arguments, directly or indirectly, that relate, refer or pertain to the assignment as illegal, void, unenforceable, unethical, or the like.

## VI.    ARGUMENT – JOHN BUCHEIT AND MARY ROBINSON

### A.    Bar Bucheit and Robinson From Offering Gratuitous Testimony Regarding Breaches of the Standard of Care or Fiduciary Duties, or Violations of the Rules of Professional Conduct

The Defendants move this Honorable Court to enter an Order barring the Plaintiff, and her witnesses, experts (specifically including Bucheit and Robinson) and attorneys, from making any statements, offering or eliciting any testimony or opinions, or making any arguments, directly or indirectly, that relate, refer or pertain to accusations in the Plaintiff's Amended Complaint that are unsupported by expert opinions and/or expert criticisms of actions or omissions that did not proximately cause any of the Plaintiff's asserted damages, and in support thereof state as follows

1.    As recounted above, the Plaintiff's Amended Complaint asserts a long list of various accusations against the Defendants under the heading of Breach of Fiduciary (Count I) and legal malpractice (Count II).  Many of the Plaintiff's accusation are not supported by expert opinion testimony, and many of the opinions offered by Bucheit and Robinson are purely gratuitous in the sense that they do not tie into any proximately caused damage.

2.    "Because the concept of *res ipsa loquitur* is not applicable in legal malpractice cases, the standard of care against which the attorney defendant's conduct will be measured must generally be established through expert testimony." *Barth*, 564 N.E.2d at 1199-1200. "Failure to present expert testimony is usually fatal to a plaintiff's legal malpractice action." *Id.* "However, Illinois courts have recognized that where the common knowledge of experience of lay persons is extensive enough to recognize or infer negligence from the

facts, or where an attorney's negligence is so grossly apparent that a lay person would have no difficulty appraising it, expert testimony as to the applicable standard of care is not required. *Id.*

3.  In *Barth*, the Illinois Supreme Court held that plaintiff's claims that defendant-attorney was negligent for communicating to plaintiff's husband rather than plaintiff, which relied on details of the legal relationships between the parties and how they related to the plaintiff's rights as a trust beneficiary in the underlying litigation "would not be within the common knowledge of lay persons." *Id*. Instead, "expert testimony was required at trial to explain not only the legal relationship that the trust agreement created between plaintiff and her husband, but also how defendant could or should have viewed this relationship when he funneled all the information dealing with the trust properties through [the husband]. *Id.*

4.  Similarly, in *Ball*, the plaintiff brought a legal malpractice claim alleging defendant-attorney violated his duty to plaintiff by failing to communicate plaintiff's interests to her in violation of the Illinois Rules of Professional Conduct. 723 F.3d 813. The Seventh Circuit stated "a violation of the Rules in and of itself does not establish liability in a legal malpractice case, and there is a difference between having a 'duty' to do something under the Rules and determining just what 'something'—i.e., the standard of care—encompasses." *Id.* at 823. The Seventh Circuit found that:

    *[I]t would not be readily apparent to a lay juror as to (1) whom [defendant] was required to communicate with; (2) the type of communication required (e.g., letter, email, phone, in-person); (3) how often [defendant] was required to communicate; (4) what specific information [defendant] was required to communicate; (5) and what steps [defendant] was required to take in response to the information and issues presented in this particular situation."*

    *Id.* at 824.

5.  In Count I, the Plaintiff charges the Defendants with breaching their fiduciary duties as her

attorneys by violating Rules 1.0(e), 1.2, 1.4, 1.5, 1.8, 1.15, and 1.16 of the Rules of Professional Conduct. Doc. 27, Count I, ¶ 56(a) through (l).

6.    The Rules of Professional Conduct provide that violation of a particular Rule should not, in and of itself, give rise to a cause of action against a lawyer or to a presumption that any attorney has breached a duty. IRPC Preamble, at Comment 20. The Rules are not designed to be a basis of civil liability, and the fact that a Rule is a just basis for a lawyer's self-assessment should not allow for them to be "subverted when they are invoked by opposing parties as procedural weapons." *Id.*

7.    Despite all the foregoing attempts to weaponize the Rules as some font for attorney-fiduciary duty liability, the Plaintiff has failed to sustain most of her allegations in Count I through expert testimony. Notably, Robinson only offers opinions regarding Rule 1.7 (which the Plaintiff did not even allege in the pleading), Rule 1.8 and, arguably, Rule 1.2. See Ex. E, Robinson Report. As the Plaintiff has not offered expert opinion testimony to substantiate the Plaintiff's accusations relating to Rules 1.0(e), 1.4, 1.5, 1.15 or 1.16, much less that any such purported violations proximately caused the Plaintiff any harm, it would be inappropriate and highly prejudicial for the Plaintiff to present those accusations to the jury. See *Ball*, 723 F.3d at 829.

8.    In Count II of her Amended Complaint, the Plaintiff asserts that the Defendants were professionally negligent in various ways. Doc. 27, Count II, ¶ 62. Essentially, the Plaintiff alleges that the Defendants should not have allowed the Underlying Litigation to settle without investing in substantially more written and oral discovery, facing and/or defeating a possible summary judgment motion, and possibly even preparing for and conducting a trial on the merits. At its core, the Plaintiff's legal malpractice is nothing more than a

standard insufficient settlement case. However, the Plaintiff's legal malpractice standard-of-care expert witness, Bucheit, offers gratuitous opinions to the effect that the Defendants did not spend enough time reading the case file after taking over the case from prior counsel (though the Defendants spent substantially more time in that regard than Bucheit did himself), and additionally, did not conduct written and oral discovery to obtain documents and testimony that Bucheit himself has never seen, either. See Ex. A, Bucheit Report, pp. 13-14 (opinions 1 and 2).

9. The fact that an attorney may have breached his duty of care is not, in itself, sufficient to sustain a client's cause of action for legal malpractice. *Northern Illinois Emergency Physicians v. Landau, Omahan & Kopka, Ltd.*, 216 Ill.2d 294, 306 (2005). Even if negligence on the part of an attorney is established, "no action will lie against the attorney unless that negligence proximately caused damage to the client" and "the injury in a legal malpractice action is a pecuniary injury to intangible property interest[; it] is not a personal injury." *Id*., at 306-307. In *Landau*, the Illinois Supreme Court found a gap between the asserted breach by the lawyer and the claimed damages by the client with respect to a $4 million indemnity judgment. Finding that the plaintiff was responsible for that judgment directly through no asserted fault of the lawyer, the fact that it was also responsible for that judgment indirectly meant that the lawyer's breach of care did not proximately cause the client's purported damages as a matter of law. *Id*., at 310-314 ("Even if the attorneys had succeeded in defeating the indemnity claim as time-barred, [the plaintiff's] situation would still be unchanged. It still would have been liable for $4 million in damages.").

10. Bucheit's first opinion posits that a reasonably careful attorney "would have devoted far more time and effort than [the Defendants] to reviewing, analyzing, and learning the facts,

evidence and issues of [the Plaintiff's underlying] case." Ex. A, Bucheit Report, pp. 13-14.  However, he never identifies what that enhanced review, analysis, and learning would have imparted on the Defendants in regards to their understanding of the case, or how that would have intrinsically added any value to the Plaintiff's case.  Just as the underlying case in *Northern Illinois* had an intrinsic (negative) value separate and apart from the alleged negligence of the attorney there, the Plaintiff's case value was not dependent upon the amount of time the Defendants spent reviewing it.  As such, Bucheit's opinion that the Defendants should have spent more time studying the Plaintiff's file (when the Defendants had already spent more time on that file than Bucheit himself ever did) is a gratuitous opinion unconnected to any proximately caused harm to the Plaintiff or her underlying case value:  it fails to tell the jury what the Defendants would have learned and how that would have benefitted the Plaintiff, and thus similarly fails to tell the jury how the Defendants' supposed failure in this regard harmed the Plaintiff in any way.

11.     Similarly, Bucheit's second opinion also suffers from a lack of any proximate causal connection between the asserted failure to conduct additional discovery and any harm to the Plaintiff or the Underlying Litigation.  Quite simply, the discovery Bucheit claims that the Defendants should have performed has never been performed:  the witnesses he claims should have been deposed never were, and the documents he claims should have compelled from Deloitte have never even been sought, even in this litigation.

12.     An unsuccessful legal malpractice plaintiff tried to make a similar accusation in *Serafin v. Seith*, 284 Ill.App.3d 577 (1st Dist. 1996).  There, the plaintiff claimed that his attorney should have done more.  Specifically, he claimed that his attorneys should have provided him with additional advice regarding documents he signed consensually giving up certain

rights in a company. Because Serafin only owned thirty percent of that company anyway, the *Serafin* court inferred that the majority shareholders still would have gone forward with the change without Serafin's consent.

13. Like Serafin, Bucheit offers nothing to establish that the absence of additional discovery, like the absence of additional advice, would have made any difference in the Plaintiff's Underlying Litigation. That discovery has never been undertaken – even by the Plaintiff in <u>this</u> case – so there is no basis to infer one way or the other what it would have shown with respect to Deloitte.

14. As such, Bucheit's opinion that the Defendants should have spent more time either reviewing the discovery that already existed in the Underlying Litigation or obtaining additional discovery that had yet to be performed in the Underlying Litigation (and never was performed in this case) has no tendency to prove or disprove any fact of consequence in this litigation other than to gratuitously criticize the Defendants. Accordingly, any probative value behind such criticisms would be substantially outweighed by the prejudice of accusing the Defendants of malpractice for things that have no proximate causal connection to the Plaintiff's alleged damages.

Wherefore, the Defendants respectfully request that this Honorable Court enter an Order barring the Plaintiff, and her witnesses, experts and attorneys, from making any statements, offering or eliciting any testimony or opinions, or making any arguments, directly or indirectly, that relate, refer or pertain to accusations in the Plaintiff's Amended Complaint that are unsupported by expert opinions and/or expert criticisms of actions or omissions that did not proximately cause any of the Plaintiff's asserted damages.

## VII. ARGUMENT – KATHLEEN GRAHAM

## A.      Bar Graham Entirely (*Daubert*)

The Defendants move this Court in limine to enter an Order barring the Plaintiff, and her witnesses, experts and attorneys, from making any statements, offering or eliciting any testimony or opinions, or making any arguments, directly or indirectly, that relate, refer or pertain to the opinions of Kathleen Graham as set forth in the Expert Report of Kathleen A. Graham, and in support thereof state as follows:

1. As part of her breach of fiduciary duty claim, the Plaintiff asserts that certain non-monetary terms in the underlying Settlement Agreement (Doc. 182), and particularly the "no future employment" clause, (Doc. 182, Section 12, pp. 17-20), prohibit her from obtaining gainful employment in the consulting industry.  In support of this theory, the Plaintiff disclosed the expert testimony of Kathleen A. Graham.  See Ex. G, Expert Report of Kathleen A. Graham dated March 23 2018 ("Graham Report").  Graham was deposed on October 11, 2018.  Ex. H, Deposition Transcript of Kathleen Graham dated October 11, 2018 ("Graham Deposition").

2. Against this legal backdrop set forth in Section III of this Motion, the Plaintiff should be barred from offering opinions given by Graham in the Graham Report and during the Graham Deposition for the reason that her methodology is flawed and thus not reliable.

3. The Graham Report numbers fifteen pages, consisting of three pages of Graham's resume, one page dedicated to explaining her lack of any experience as an expert and the fees she will be charging for this assignment, five pages of analysis divided into two sections, four pages of tables, and one final page identifying the "facts or data considered." This Motion challenges Graham's opinions as employing flawed and unreliable methodology.

4. In Section I of her report, Graham reviews various provisions contained within the

Underlying Settlement Agreement, most of which she has never seen before in the "recruitment industry" compared against non-compete agreements entered into between senior executives and junior employees. See Ex. G, Graham Report, p. 5 (point 1), p. 6 (point 2), p. 7 (points 3 and 4), and p. 8 (point 5). As to the actual "no future employment" clause, Graham opines that <u>if the Plaintiff tells a prospective employer of that provision</u>, few employers would hire her. See Ex. G, Graham Report, p. 6 (point 2), and p. 7 (points 3 and 4). On the other hand, <u>if the Plaintiff does not tell a prospective employer of that provision</u>, Graham opines that an employer who finds out about the provision <u>might</u> fire her for cause for withholding its existence. Ex. G, Graham Report, p. 6 (point 2) and p. 7 (points 3 and 4). Indeed, during her deposition, Graham consistently testified that the Plaintiff would need to disclose the existence of the "no future employment" clause to her future employers. See Ex. H, Graham Deposition, 49:6-7 and 75:21-76:3.

5.      Graham subsequently clarified that she was considering literature and recommendations from the "Society of Human Resources Society" (sic) that "say [to] have [disclosure] requirements put into your pre-employment agreements and contracts. If that is in one of those contracts, [the Plaintiff] needs to show [the "no future employment"]." Ex. H, Graham Deposition, 99:10-17, (referring to the Society for Human Resource Management). In support of this assertion, and twelve days after her deposition was completed in this case, Graham produced a document – which she obtained six days after her deposition from SHRM's website – entitled *Agreement: Model Employment Contract*. See Ex. I, SHRM Agreement: Model Employment Contract, indicating a date accessed of October 17, 2018 ("SHRM Agreement").

6.      In Section II of the Graham Report, she opines that had the Plaintiff not signed the

Underlying Settlement Agreement containing the "no future employment" clause, there is a "high probability" that the Plaintiff would have achieved certain levels of career and income advancement. However, at her deposition, Graham clarified that she is not offering an opinion that the Plaintiff is losing out on certain dollar figures as a result of the Underlying Settlement Agreement. Ex. H, Graham Deposition, 84:21-85:8.

7.  *Daubert* and Rule 702 do not permit expert testimony in such circumstances, for it is "critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusions the expert's testimony is intended to support. *Mamah*, 332 F.3d at 478; *see also*, *Barth*, 564 N.E.2d at 1199-1200 ("Because the concept of *res ipsa loquitur* is not applicable in legal malpractice cases… the standard of care against which the attorney defendant's conduct will be measured must generally be established through expert testimony" (internal citation omitted)).

8.  The first flaw in Graham's methodology, and indeed, the flaw driving all of her conclusions, is her conclusion that the "no future employment" clause is a non-compete agreement, as the Underlying Settlement Agreement does not support her own definition. When asked whether she was considering the Settlement Agreement as a non-compete agreement, Graham offered the following definition of "non-compete": "The word noncompete means an agreement not to compete between an employer and an employee." Ex. H, Graham Deposition, 30:4-5. When describing the Settlement Agreement, and particularly "no future employment" clause, Graham explained "[I]t was a highly restrictive employee agreement between a former employee and the employer." Ex. H, Graham Deposition, 30:6-7. Despite the absence of the critical employee-employer relationship, and lacking any restriction on actual "competition," Graham nevertheless

equated the "no future employment" clause as "a noncompete." Ex. H, Graham Deposition, 30:8-9.

9.    Graham was clear that she was not retained to offer a legal interpretation. Ex. H, Graham Deposition, 59:13-16. Graham has no legal training (Ex. H, Graham Deposition, 12:0-11), and had to employ an attorney even to write up her own engagement agreement to serve as an expert in this case (Ex. H. Graham Deposition, 17:6-15). Thus, she had no basis to analogize the "no future employment" clause to a non-compete agreement in the first instance. Compounding matters further, having first determined that she was dealing with a non-compete, Graham then applied further legal reasoning (which she is neither educated nor trained to apply) in determining that the Plaintiff would have had to disclose the existence of the "no future employment" clause to any potential employer who utilized the SHRM employment contract. Ex. H, Graham Deposition, 99:10-17. As shown in the document Graham subsequently discovered, the SHRM Agreement only requires the disclosure of actual agreements "not to compete." See Ex. I, SHRM Agreement, p. 3, ¶ 5 (handwriting in the original).

10.    The word "compete" does not appear anywhere in the Underlying Settlement Agreement, much less in the "no future employment" clause. See Doc. 182, Section 12, pp. 17-20. If anything, by prohibiting the Plaintiff from working for Deloitte, or from working for anyone working on a project for Deloitte, the "no future employment" clause can only be described as a pro-compete agreement (it allows her to work for Deloitte's competitors), and it was methodological error for Graham to attempt analogy between legal polar opposites.

11.    Notwithstanding the fact that the "no future employment" clause is not a non-compete

agreement, an additional error in Graham's methodology occurs in that the clause, in the Plaintiff's case, is irrelevant under Graham's analysis. Specifically, Graham was asked whether a person such as the Plaintiff would have to disclose the essential thrust of the "no future employment" clause in the absence of its written existence if the person knew facts indicating that a former employer would, in the future, take the position(s) Deloitte reserved for itself under the "no future employment" clause under the following hypothetical:

> Q. An applicant for a job is aware that a former employer of hers would terminate her if it were to subsequently take over a company at which she is then presently employed, it would terminate her under those circumstances.
> A. That's the new company or the old company?
> Q. The old company buys a new company and the applicant happens to be employed at that new company at the time that it's acquired and the applicant knows that under those circumstances the former employer would terminate her. Do you understand that assumption?
> A. Yes.
> Q. Assuming that some applicant could possibly know that, is that something that the applicant would be required to disclose to that potential employer?
> A. Yes, if they're covered by that SHRM. If they're following SHRM's recommended contracts, yes.

Ex. H, Graham Deposition, 105:12-106:5.

12. Thus, according to Graham, regardless of the existence of the "no future employment" clause, if the Plaintiff was aware that Deloitte would never hire her again, and never allow one of its subcontractors to hire her, she would have to disclose that fact to potential employers. However, Graham never identifies any place where she asked the Plaintiff whether the Plaintiff was aware of those intentions by Deloitte in the absence of the "no future employment" clause. In other words, Graham did not control for a false positive between the existence of the clause and an independent variable that would, to an equal degree, lead to the same outcome: a potential employer deciding against hiring the Plaintiff.

13.     This is, of course, to say nothing of the fact that Graham never actually tested her hypothesis by actually suggesting the Plaintiff as an employment candidate to any of her "top-tier" clients to see whether she was employable, and if so, whether the "no future employment" clause, in and of itself, was a determinative factor in the Plaintiff not being offered employment.  See Ex. H, Graham Deposition, 58:8-13.  Contrary to Graham's assertion, nothing in the "no future employment" clause prohibited her from submitting the Plaintiff to any employer to test her hypothesis, and indeed, Graham ultimately admitted that she would need to consult an attorney to determine whether she could provide a client of hers with the Plaintiff's resume.  See, Ex. H, Graham Deposition, 102:20 – 103:3.  Methodologically speaking, Graham's opinions derive from building upon one flawed assumption after another to reach a conclusion that while testable, was never tested.  As such, Graham should be barred from offering any opinions in this case.

Wherefore, the Defendants respectfully request that this Honorable Court enter an Order barring the Plaintiff, and her witnesses, experts and attorneys, from making any statements, offering or eliciting any testimony or opinions, or making any arguments, directly or indirectly, that relate, refer or pertain to the opinions of Kathleen Graham as set forth in the Expert Report of Kathleen A. Graham.

## VIII.   ARGUMENT – MARY ROBINSON AND DR. LOUIS J. KRAUS

The Defendants move to limit the testimony of Robinson and to bar the testimony of Kraus because (a) the Plaintiff is not entitled to recover emotional distress-type damages in this case, and (b) even if she were so entitled, there is no evidence of a causal link between the Defendants' purported fiduciary breaches and her emotional distress.

### A.      Bar Emotional Distress Testimony as Unrecoverable

The Defendants move this Honorable Court to enter an Order barring the Plaintiff, and her witnesses, experts (specifically including Robinson and Kraus) and attorneys, from making any statements, offering or eliciting any testimony or opinions, or making any arguments, directly or indirectly, that relate, refer or pertain to the Plaintiff's asserted pain, suffering, or emotional distress, and in support thereof state as follows:

1.  At the core of her breach of fiduciary duty claim, the Plaintiff asserts that the Defendants improperly obtained the Assignment from her. See Doc. 27, at ¶ 1 (the assignment "serve[s] as the catalyst" for the Plaintiff's breach of fiduciary duty claim).

2.  Through Robinson, the Plaintiff claims that the Assignment constituted a breach of fiduciary duty because the Defendants "acquired a proprietary interest" in the Plaintiff's underlying cause of action – thereby somehow creating a concurrent conflict of interest between the Plaintiff and the Defendants – which also constituted a prohibited business transaction between lawyers and client. See Ex. E, Robinson Report, pp. 6-7. Robinson also claims that the Defendants breached their fiduciary duties to the Plaintiff by failing to provide the Plaintiff with proper admonishments, including the right to seek independent counsel, in obtaining the Assignment. Ex. E, Robinson Report., pp. 7-8.

3.  In addition to criticizing the beginning of the Defendants' attorney-client relationship with the Plaintiff, Robinson also opines negatively regarding the tail-end of that relationship. Specifically, Robinson assert that the Defendants again breached their fiduciary duty by engaging in settlement negotiations in the underlying case that included Deloitte's payment of the Defendants' attorneys' fees. Ex. E, Robinson Report, p. 8. Finally, Robinson opines that the Defendants breached their fiduciary duty to the Plaintiff by referencing the existence of the Assignment as potentially affecting the Plaintiff in the event that the

Defendants were forced to withdraw as her counsel if she continued to not abide by the Defendants' request for information. Ex. E, Robinson Report, at p. 9.

4.  Robinson <u>does not</u> identify any proximately caused damages that result from the existence of the Assignment or the Defendants' reference to the Assignment. For example, Robinson asserts that the assignment is "an ownership interest" in the Underlying Litigation distinguishable from a contingency fee or a statutory lien, because the assignment gave the Defendants "control of a cause of action." See Ex. E, Robinson Report, p. 6. However, she does not identify any instance where the Defendants exerted that purported cause of action adversely to the Plaintiff's intentions regarding attorneys' fees in the underlying case.[8]

5.  Similarly, Robinson's conflict of interest theory against the Defendants does not extend to proximately caused damages. She claims that the Defendants "put themselves in position to advance their own interests to Plaintiff's detriment," but she does not identify any way in which the Defendants actually exercised that position. See Ex. E, Robinson Report, p. 8. The closest Robinson comes is when she asserts that the Defendants "succeed[ed] in persuading Deloitte to increase payment of their attorney's fee claim without a corresponding increase to Plaintiff's damage recovery" (see Ex. E, Robinson Report, p. 8), but shifting the entirety of the fee to the Plaintiff's recovery, as explained in footnote 5 immediately above, would have actually served only to damage the Plaintiff's net recovery

---

[8]     The fee-shifting provisions under Title VII, the ADA, and the FMLA are not causes of action unto themselves. Those provisions are part of the overall statutory schemes' <u>remedial</u> measures, and only apply to the extent that the claimant is successful. See *e.g. Gillispie v. Village of Franklin Park*, 405 F.Supp.2d 904, 911 (N.D.Ill 2005). There is no evidence to establish that the Plaintiff ever wished to waive the ability to have her former employer pay her attorneys' fees, especially where such a waiver would have operated to the Plaintiff's pecuniary detriment. The underlying monetary settlement provided $X to the Plaintiff and $Y to the Defendants in attorneys' fees <u>in lieu of</u> a one-third contingency. Had the Plaintiff foregone her right to statutory attorney's fees such that the one-third contingency fee applied to $X, her actually recovery would have been less than it was (and this is to say nothing of the $20,000 advance payment retainer the Defendants agreed to refund the Plaintiff despite accruing well over $Y plus $20,000 while representing the Plaintiff.

after paying the Defendants' contingency fee.

6.   Indeed, even claiming that the Defendants "retain[ed] an ability to pursue Plaintiff's full fee claim if they did withdraw" is an expressly recognized ability the Defendants had in the absence of an assignment. See *Citizens Legal Environmental Action Network, Inc. v. Premium Standard Farms, Inc.*, 397 F.3d 592, 594-595 (8th Cir., 2005) (discharged plaintiffs' attorney firm negotiated directly with the defendant for payment of its fees, with the Court finding that the plaintiffs' "loss of control, however, has no practical consequence – and negligible equitable significance – if the prevailing party is not in fact inclined to use control of fee negotiations to bargain for a better settlement.").[9]

7.   Lacking any damages caused by the fiduciary breaches that Robinson tries to explain, the Plaintiff instead claims that the Defendants' purported breach(es) of their fiduciary duties caused "damages associated with [her] pain, suffering, and emotional distress." See Doc. 27, ¶ 59(b).

8.   In support of her claim for emotional distress damages she claims to have been proximately caused by the Defendants' asserted breach(es) of their fiduciary duties, the Plaintiff disclosed Kraus to opine that the proximate cause of the Plaintiff's present condition – not mentioned here specifically due to Confidentiality and Qualified Protective Orders entered in this cause – was the Plaintiff's "interaction" with the Defendants. See Ex. C, Evaluation of Louis J. Kraus, MD dated April 5 2018 ("Kraus Report"), p. 2.[10]

9.   However, Illinois law precludes the Plaintiff from recovering emotional distress damages in this context.

---

[9]   As stated in fn. 5, there is no evidence to establish that the Plaintiff ever wished to waive the ability to have her former employer pay her attorneys' fees.

[10]   Exhibit C to this Motion will not be filed contemporaneously with this Motion. It was previously filed under seal as Doc. 259. Doc. 259 will be provided to the Court as part of the full set of briefs relative to this Motion.

10.     In *Doe v. Roe*, 289 Ill.App.3d 116 (1st Dist. 1997), the Illinois Appellate Court explained that the facts surrounding the alleged breach of fiduciary duty involved there "paint a most egregious set of circumstances." *Id.*, at 124. The Court explained, however, that the essential purpose of the attorney-client relationship is the provision of competent legal services and does not give rise to a (fiduciary) duty on the part of the attorney to improve a client's emotional or mental well-being. *Roe*, 289 Ill.App3d, at 129 (citation omitted). *Id.* Invoking the common law concept "that recoverable damages are those which naturally result from the breach, or are the consequence of special or unusual circumstances which are in the contemplation of the parties [at the relevant times]," the *Roe* Court reiterated that "recovery for mental distress is 'excluded unless . . . [the relationship] or the breach is of such a kind that serious emotional distress was a particularly likely result." *Id.* (citations omitted).

11.     Addressing the relationship aspect, the Court explicitly stated "there is nothing in the nature of the attorney-client relationship which, of itself, would allow us to conclude that an attorney is on notice that a breach of fiduciary duty would likely result in serious emotional distress to his client." *Id.*, at 130. The Court's finding in this regard was made notwithstanding its acknowledgement that certain types of legal representations (family law matters as the given examples there) "inherently give rise to emotional issues." *Id.*, see also *Collins v. Reynard*, 154 Ill.2d 48, 50-52 (1992) (recognizing that legal malpractice claims may be couched in either contract or tort, but maintaining the exclusion of personal injury damages regardless of the theory used).

12.     Accordingly, the *Roe* Court then focused on the surrounding circumstances of the alleged breach of fiduciary duty to determine whether Doe could state a claim for emotional

distress damages. First, Doe alleged that she retained Roe to represent her in an emotionally trying divorce. Second, Doe alleged that Roe knew she was experiencing feelings of anxiety and insecurity, and specifically discussed her emotional and sexual history with Roe. Third, Doe alleged that she became dependent on Roe, and inferred that Roe knew or should have known that Doe had become (legally and emotionally) dependent upon him. Fourth, Doe alleged that Roe coerced her into having sexual relations with him by instilling in her fear that he would discontinue or compromise his representation of her if she did not comply and she could not afford to pay the retainer for another attorney. *Roe*, 289 Ill.App.3d 130-131.

13.     Doe further alleged that Roe made repeated sexual demands upon which she accepted because of her dependence upon him for both legal and emotional support. Finally, she alleged that she sustained emotional distress as a result of having engaged in a continuing sexual relationship with Roe, and alleged sufficient facts to raise the inference that Roe knew or should have known of Doe's (legal and emotional) dependence on him and the emotional distress that could result if he were to coerce her into having sexual relations with him. *Id*., and at 121.

14.     Conversely, the Illinois Appellate Court has held that no emotional distress damages are available for a client who is dissatisfied with a settlement agreement. *Hanumadass v. Coffield, Ungaretti and Harris,* 311 Ill.App.3d 94, 97 (1st Dist. 1999).

15.     In *Hanumadass,* a physician alleged that the defendant attorneys settled a wrongful death and malpractice claim that had been filed against him and a hospital without his consent. *Id.*, at 96. The physician alleged that in accordance with the Medical Practice Act, the settlement was reported to the Illinois Department of Professional Regulation, and that it

51

was only when the physician received a letter from the State disciplinary board that he learned of the settlement. *Id.*

16.    The physician filed a claim against the law firm that had defended him and the hospital in the underlying case, alleging, *inter alia,* that the attorneys breached their fiduciary duties, failed to provide competent representation, and violated eight (8) of the Illinois Rules of Professional Conduct. *Id.* at 97. The physician claimed that, as a result of the attorney's conduct, he suffered emotional distress and sought damages for loss of reputation, embarrassment, health and state of mind. *Id.* He further claimed that the underlying settlement and subsequent report to IDFPR impacted his ability to "fully perform his life's work." *Id.*

17.    The First District Appellate Court in *Hanumadass* discussed the differences in the therapist-patient relationship with that of the attorney-client relationship, reiterating that the purpose of the attorney-client relationship "does not give rise to a duty on the part of the attorney to improve a client's mental or emotional well-being." *Hanumadass,* 311 Ill.App.3d at 99-103. The Court further compared the facts in *Hanumadass* with *Doe v. Roe*, finding that that law firm's mistake of not informing the physician about the settlement earlier was not "so egregious as to warrant noneconomic damages" and certainly did not rise to the level of an attorney "coercing [a client] into a sexual relationship." *Id.*

18.    In this case, the Plaintiff's Amended Complaint alleges:

   a.    At the time Defendants and Plaintiff entered into their attorney-client relationship, the record in the underlying case against Employer (which were designated as confidential and protected by a HIPAA protective) put Defendants on notice that any breach of their fiduciary duties to the Plaintiff or failing to treat Plaintiff civilly and professionally would cause Plaintiff to suffer emotional distress and psychological injury (see Doc. 27, ¶ 46 (*emphasis added*)); and

   b.    Defendants repeatedly subjected Plaintiff to intimidation, threats, anger, disrespect, disdain, and arrogance which they knew or should have known would cause

Plaintiff additional psychological injury and emotional distress separate and apart from the pecuniary losses which she was seeking to recover from Employer (Doc. 27, ¶ 47).

19. Of course, Robinson offers no opinion to support her assertions that the Defendants treated the Plaintiff uncivilly or unprofessionally, or otherwise subjected the Plaintiff to intimidation, threats, anger, disrespect, disdain, or arrogance, much less in breach of any fiduciary duty. But more importantly, Robinson offers no opinions to establish that the particular attorney-client relationship between the Defendants and the Plaintiff, performed almost exclusively through email and telephone communications, was "such a kind" as would lead a reasonably careful attorney to appreciate that serious emotional distress was a particularly likely result. *Roe*, 289 Ill.App3d, at 129. Similarly, Robinson offers no opinion that a reasonably careful attorney would have known that taking an assignment of attorney's fees, or referencing to its possible effect in the event of withdrawal, would be "likely to cause emotional distress for reasons other than pecuniary loss." *Id.*, at 130. ("It is only when the attorney has reason to know that a breach of his fiduciary duty is likely to cause emotional distress, for reasons other than pecuniary loss, that damages will be given as compensation for mental suffering.").

20. Rather, the alleged conduct in this case is much more similar to *Hanumadass*, where the physician claimed that the attorneys' conduct in settling an underlying case ultimately caused him shame, embarrassment, worry, and was a detriment to his overall health and state of mind.

21. The standard of care against which an attorney's conduct will be measured must generally be established through expert testimony, and the failure to present such an expert is usually fatal. *Barth*, 564 N.E.2d at 1199-1200. The exception to this rule occurs when the

knowledge or experience of lay persons is extensive enough to recognize or infer a breach from the facts, or the breach is so grossly apparent that lay persons would have no difficulty in appraising it. *Id.* The only exceptions recognized in *Barth* are where the attorney defendant took no action whatsoever on an estate matter, failed to exercise due diligence in obtaining service on a defendant in a lawsuit, or allowed the undisputed statute of limitations applicable to the client's claim to run without filing suit. *Id.*

22.   In order for the Plaintiff to have established her entitlement to seek emotional distress damages, she was required to offer expert testimony to establish that a reasonably careful attorney would have appreciated that emotional distress was likely to be caused by either the attorney-client relationship with the Plaintiff or the particular breaches identified by Robinson. As the Plaintiff has failed to do so, she should be barred from seeking damages for asserted pain, suffering, or emotional distress.

Wherefore, the Defendants respectfully request that this Honorable Court enter an Order barring the Plaintiff, and her witnesses, experts and attorneys, from making any statements, offering or eliciting any testimony or opinions, or making any arguments, directly or indirectly, that relate, refer or pertain to the Plaintiff's asserted pain, suffering, or emotional distress.

**B.      Bar Emotional Distress Testimony for Lack of Causation Evidence**

The Defendants move this Honorable Court to enter an Order barring the Plaintiff's experts Mary Robinson and Dr. Louis J. Kraus, and in support thereof state as follows:

1.   In Count I of her Amended Complaint, the Plaintiff raises numerous allegations by which she asserts that the Defendants breached their fiduciary duties as her attorneys in the Underlying Litigation. See Doc. 27, Count I. As a result of those alleged breaches, the Plaintiff seeks, *inter alia*, damages "associated with Plaintiff's pain, suffering, and

emotional distress caused by the Defendants' coercive and abusive conduct and other violations of their fiduciary duties." Doc. 27, ¶ 59(b).

2.   In order to prove a claim for breach of fiduciary duty, the Plaintiff must establish "(1) that a fiduciary duty exists; (2) that the fiduciary duty was breached; and (3) <u>that such breach proximately caused the injury of which the party complains</u>." *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, at ¶ 12 (citations omitted and emphasis added).

3.   The Plaintiff has disclosed Robinson to opine on the ways the Defendants purportedly breached their fiduciary duties. See Ex. E, Robinson Report. According to Robinson, the Defendants breached their fiduciary duties to the Plaintiff by (1) taking the Assignment from the Plaintiff of her statutory attorney's fees from Deloitte, if she were to succeed in the Underlying Litigation (Ex. E., Robinson Report, pp. 6-8); (2) negotiating a settlement with Deloitte while operating under a conflict of interest as a result of the Assignment (*Id.*, p. 8); and (3) "when [the Defendants] used the threat of moving to withdraw and then enforcing the Assignment . . . if Plaintiff would not go forward with settlement on the terms [the Defendants] recommended" (Ex. E, Robinson Report, p. 9).[11]

4.   Indeed, Robinson agreed that her opinions in this case "essentially bookend the representation of the plaintiff, Ms. Kormi, by the defendants, Lee and Choate." See Ex. F, Deposition Transcript of Mary Robinson dated September 20 2018 ("Robinson Deposition"), 68:2-10.

5.   In support of her claim for damages she claims to have been proximately caused by the

---

[11]   This third-basis is directly related to *Exhibit C* to the Plaintiff's Amended Complaint. See Doc. 27, page 37 of 38. However, the September 21, 2014 email depicted at *Exhibit C* did not make an ultimatum of the Plaintiff agreeing to any settlement terms. Instead, the predicate to seeking leave to withdraw was "Should [the Plaintiff] continue to refuse to inform [the Defendants] which specific terms of the Final Settlement Agreement concern [her] and what [her] concern is for each such term." See *Exhibit C* to the Plaintiff's Amended Complaint.

Defendants' asserted breach(es) of their fiduciary duties, the Plaintiff has disclosed Kraus to opine that the proximate cause of the Plaintiff's present condition was the Plaintiff's "interaction" with the Defendants. See Ex. C, Kraus Report, p. 2.

6.     However, Kraus did not link the Plaintiff's present condition to any of the breaches identified by Robinson. For example, Kraus explained that he was not opining that any particular email caused the Plaintiff's condition. See Ex. D, Deposition of Louis J. Kraus, MD, dated October 9, 2018 ("Kraus Deposition"), 84:5 – 85:1.[12] He testified that it was "the relationship" between attorneys and client that caused the condition in his opinion. Kraus Deposition, 85:2 – 86:10. Yet, Robinson did not opine that the day-to-day manifestation of the attorney-client relationship between the Defendants and the Plaintiff was in breach of the Defendants' fiduciary duties. For example, she did not opine – as alleged in the Plaintiff's Amended Complaint – that the Defendants treated the Plaintiff "[un]civilly," or "[un]professionally," or with "anger, disrespect, disdain, [or] arrogance." See Doc. 27, ¶ 46-47. Nor did Robinson opine as to any "good cop/bad cop" manipulative behavior. Doc. 27, ¶ 47. Indeed, Robinson never opined that the way in which the Plaintiff was treated by the Defendants constituted a breach of the Defendants' fiduciary duties. As such, there is a disconnect in the causal chain between what the Plaintiff asserts to be breaches of the Defendants' fiduciary duties and what Kraus identifies as the proximate cause of her present condition. In other words, Kraus does not opine that the Plaintiff's claimed injury was proximately caused by anything Robinson identified as a breach.

7.     The standard of care against which an attorney defendant's conduct will be measured must generally be established through expert testimony. *Barth*, 564 N.E.2d at 1199-1200. Failure

---

[12]     Exhibit D to this Motion will not be filed contemporaneously with this Motion. It was previously filed <u>under seal</u> as Doc. 260. Doc. 260 will be provided to the Court as part of the full set of briefs relative to this Motion.

to present expert testimony is usually fatal to a plaintiff's case. *Id.* In *Barth*, the Illinois Supreme Court held that plaintiff's claims that defendant-attorney was negligent for communicating to plaintiff's husband rather than plaintiff, which relied on details of the legal relationships between the parties and how they related to the plaintiff's rights as a trust beneficiary in the underlying litigation "would not be within the common knowledge of lay persons." *Id.*. Instead, "expert testimony was required at trial to explain not only the legal relationship that the trust agreement created between plaintiff and her husband, but also how defendant could or should have viewed this relationship when he funneled all the information dealing with the trust properties through [the husband]." *Id.*

8.   Thus, a breach of fiduciary duty case requires more than the Plaintiff testifying about how she felt as a result of her "interactions" or "relationship" with the Defendants, or that in her opinion, the Defendants did not treat her as she wished to be treated, even if those interactions or that relationship caused her present condition according to Kraus. Because Robinson does not opine that the "interaction" or "relationship" between the Defendants and the Plaintiff was a breach of the Defendants' fiduciary duties, neither Robinson's nor Kraus' opinions in this regard are relevant.

9.   At its simplest, Robinson identifies breaches which did not cause the Plaintiff's condition, and Kraus identifies a condition that was not caused by any breach, and these two asserted facts combined do not have the ability to prove or disprove any fact of consequence in this litigation because they do not establish that a particular breach of fiduciary duty by the Defendants proximately caused the Plaintiff's condition as required under *Lawlor*, 2012 IL 112530, ¶ 12. See Fed. R. Evid. 401 and 402.  As such, the prejudice to the Defendants of allowing either Robinson or Kraus to testify to an uncompleted claim for breach of

fiduciary duty far exceeds the probative value, if any, of their disjointed opinions.  See Fed.

R. Evid. 403.

Wherefore, the Defendants respectfully request that this Court enter an Order barring the

Plaintiff's experts Mary Robinson and Dr. Louis J. Kraus.

## IX.    CONCLUSION


Dated: <u>March 26 2024</u>.

By:    _____/s/ Daniel B. Meyer_____        By:    _____/s/ Daniel K. Konicek_____

Daniel B. Meyer                              Daniel K. Konicek
Edward C. Eberspacher IV                     Amir Tahmassebi
Counsel to David L. Lee                      Counsel to Antoinette Choate
Meyer Law Group LLC                          Konicek & Dillon PC
30 North LaSalle Street                      21 West State Street
Suite 1410                                   Geneva, Illinois 60134
Chicago, Illinois 60602                      T:    630.262.9655
T:    312.265.0565                           E:    dan@konicekdillonlaw.com
E:    dmeyer@meyerlex.com                     E:    amir@konicekdillonlaw.com
E:    teberspacher@meyerlex.com

## <u>CERTIFICATE OF SERVICE</u>

       I, Daniel B. Meyer, certify that on March 26 2024, I caused the foregoing to be filed with the Clerk of the United States District Court for the Northern District of Illinois, a copy of which will be served on the following counsel through the Court's CM/ECF system:

Alan J. Mandel                       Daniel F. Konicek
Joseph E. Tighe                      Amir R. Tahmassebi
Alan J. Mandel Ltd.                 Konicek & Dillon, PC
7250 Skokie Blvd.                  21 West State Street
Skokie, Illinois 60077             Geneva, Illinois 60134
alan@mandelaw.net             dan@konicekdillonlaw.com
joe@mandelaw.net              amir@konicekdillonlaw.com

                             By:       /s/ Daniel B. Meyer
                                   Daniel B. Meyer

Daniel B. Meyer
Meyer Law Group LLC
30 North LaSalle Street
Suite 1410
Chicago, Illinois 60602
T – 312.265.0565
E – dmeyer@meyerlex.com